## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

**JAYME MAESTAS**,

Plaintiff,

v.

**TRIAD GROUP, INC**., a Wisconsin corporation; and
**H&P INDUSTRIES, INC.**, a Wisconsin corporation.

Defendants.

## PLAINTIFF'S COMPLAINT FOR DAMAGES

Plaintiff Jayme Maestas, by and through her attorneys, complains against Defendants as follows:

## NATURE OF ACTION

1.      This product liability action arises out of the Defendants' manufacture, sale and distribution of contaminated and otherwise deficient and defective alcohol prep pads. Plaintiff Jayme Maestas used the Defendants' Triad brand alcohol prep pads and developed a life threatening infection, causing her injuries and damages.

## JURISDICTION AND VENUE

2.      Plaintiff claims damages in excess of $75,000 in this action, excluding costs and interest.

3.      This Court is vested with jurisdiction of this action by the diversity statute, 28 U.S.C. § 1332.

4.      This Court is vested with venue of this incident because the subject distribution of the defective products at issue and the injuries giving rise to the causes of action occurred in this judicial district in both Denver and Lakewood Colorado, making venue appropriate pursuant to 28 U.S.C. § 1391(a).

## PARTIES

5.      Plaintiff Jayme Maestas is a resident of Lakewood, Colorado and a citizen of the state of Colorado.  Plaintiff Jayme Maestas may at times throughout this complaint be referred to as "Plaintiff."

6.      Defendant Triad Group, Inc. is a Wisconsin corporation with its principal place of business located in Wisconsin and doing business in Colorado.  At all times herein mentioned, defendant Triad Group, Inc. was and is authorized to do business within the State of Colorado, and was and is engaged in the business of deriving profit from designing, manufacturing, testing, promoting, marketing, distributing and selling alcohol prep pads for use by consumers within the State of Colorado, including the City and County of Denver.  It is believed that Triad Group, Inc. may also do business as H&P Industries, Inc.

7.      Defendant H&P Industries, Inc. is a Wisconsin corporation with its principal place of business located in Wisconsin and doing business in Colorado.  At all times herein mentioned, defendant H&P Industries, Inc. was and is authorized to do business within the State of Colorado, and was and is engaged in the business of deriving profit from designing, manufacturing, testing, promoting, marketing, distributing and selling alcohol prep pads for use by consumers within the State of Colorado, including the City and County of Denver.  It is

believed that H&P Industries, Inc. may do business as Triad Group and/or as Triad Group, Inc. It is further believed that H&P Industries, Inc. may have a corporate relationship with Triad Group, Inc.

8.     Defendant Triad Group, Inc. and Defendant H&P Industries, Inc. will hereinafter collectively be referred to as "Triad," "Triad Group," "the Triad Defendants" and/or as "Defendants."

ALLEGATIONS COMMON TO ALL COUNTS

9.     **The Triad Alcohol Product Recall**.  In early January of 2011, Triad Group announced that it was recalling all lots of its alcohol prep pads, alcohol swabs and alcohol swabsticks because of the potential for contamination that could cause life threatening infections.  Triad Group initially announced the recall in an announcement dated January 3, 2011 labelled "URGENT DRUG RECALL" and posted on its company web site.  In the URGENT DRUG RECALL announcement, Triad Group announced that it was recalling "**ALL LOTS** of ALCOHOL PREP PADS, ALCHOLOL SWABS, and ALCOHOL SWABSTICKS distributed by Triad Group . . . " The announcement stated that "This recall has been initiated due to concerns from a customer about potential contamination of the products with an objectionable organism . . . "

10.    Two days later, on January 5, 2011, the Food and Drug Administration posted the Triad recall notice on its web site, identifying the "objectionable organism" in the recalled alcohol products as the bacteria *Bacillus cereus*.  The January 5, 2011 firm recall press release explained that:   "Use of contaminated Alcohol Prep Pads, Alcohol Swabs or Alcohol Swabsticks could lead to *life-threatening infections*, especially in at risk populations, including immune suppressed and surgical patients."  (emphasis added).

11.     Despite the fact that Triad Group knew and recognized the potential for life threatening infections should its contaminated alcohol products be used by a consumer, Triad Group made insufficient efforts to ensure that consumers who were in possession of and who used the recalled products were made aware of the recall and of the risks to using the recalled alcohol pads, swabs and swabsticks.

12.     **Plaintiff's Infection Caused By Using Triad's Alcohol Pads.**  Plaintiff, who has Multiple Sclerosis, takes regular injections of Betaseron [Interferon Beta-1b], which she receives in pre-packaged injection kits that contain sterile Triad alcohol prep pads.

13.     Plaintiff receives a box of the Betaseron [Interferon Beta-1b] pre-packaged injection kits containing sterile Triad alcohol prep pads every month. Plaintiff uses the sterile Triad alcohol prep pads prior to giving herself the Betaseron [Interferon Beta-1b] injections.

14.     Plaintiff was not made aware of the recall of Triad's alcohol prep pads in a timely manner by Triad or its representatives or agents.

15.     In early February, Plaintiff developed an infection on her right hip at an injection site where she had previously given herself Betaseron [Interferon Beta-1b] injections after first using the sterile Triad alcohol prep pads at the injection site.  Plaintiff sought medical treatment for the infection, which was diagnosed as a potentially life threatening bacterial infection.  Plaintiff was immediately treated with IV antibiotics and was also treated with ongoing antibiotics.  The infection ultimately required a surgical procedure at St. Anthonys Central Hospital in Denver as well as the placement of dressings inside the wound. The care and treatment of Plaintiff's infection remains ongoing.

16.     Plaintiff learned about the recalled Triad alcohol pads only after making phone calls when she first developed the infection, including a phone call to a nurse help line

affiliated with Betaseron, which informed her of the Triad recall.  Thus, at the time that Plaintiff first received any notice at all of the recall of the Triad alcohol prep pads, she had already used the contaminated and defective alcohol pads and had already developed her infection.

17.    It was not until mid to late February, 2011, that Plaintiff received actual written notice of the recall, which was contained in her February shipment of pre-packaged Betaseron [Interferon Beta-1b] injection kits.  The pre-packaged injection kits that arrived in her February box still contained sterile Triad alcohol prep pads in the pre-packaged kits.  The box contained a notice stating:  "Do not use the Triad sterile alcohol prep pads included in this BETASERON packaging and dispose of them in the trash."  Plaintiff received this written notice over six (6) weeks after the recall was initially announced by Triad.

18.    **The Continuing Shipment of Recalled Products To Consumers Despite The Recall.**  Despite the recall and despite Triad's knowledge that the recalled products can cause life threatening infections, the recalled Triad products apparently were, as of mid-February, still being shipped to consumers.  As noted, Plaintiff's February shipment of pre-packaged Betaseron [Interferon Beta-1b] injection kits contained Triad alcohol prep pads in each pre-packaged injection kit.  No explanation was provided in this shipment as to why the recalled pads were still being sent out to consumers.

19.    **Triad's Notice Or Knowledge of Potential Contamination Problems As Well as Questionable Sterility Long Before The Recall Was Issued**.  Triad knew or should have known of the potential for contamination in its products long before it issued its recall. Indeed, quality control, quality assurance and potential contamination problems at its manufacturing facility have been documented by federal inspectors going back to 2009 and

reflect a manufacturing and quality control process with widespread deficiencies and inadequate safeguards to ensure that consumers received sterile and uncontaminated products.

20.    Triad also knew or should have known that the problems with its alcohol prep pads and other alcohol products went beyond mere contamination.   As set forth herein in more detail, Triad knew or should have known that it was distributing alcohol prep pads purported to be "sterile" and labelled as "sterile" that were not properly tested or validated as sterile and were likely not sterile, and Triad knew or should have known that the distribution of such products could cause infections to patients and consumers relying on such "sterile" alcohol prep pads to clean and disinfect an injection site prior to an injection.

21.    Triad has been the subject of multiple Food and Drug Administration ("FDA") Form 483 reports detailing quality control and other health and safety related deficiencies at its manufacturing facility, including issues relating to potential contamination as well as sterility deficiencies in its products, including but not limited to sterile alcohol prep pads.  The FDA issued Form 483 reports on Triad's manufacturing facility in July of 2009, May of 2010, and January of 2011.  These reports, with certain redactions, have now been posted on-line by the FDA and are publicly accessible via the FDA's ORA electronic reading room web site. (References herein to the Form 483 reports refer only to the portions of the reports that have been made publicly available by the FDA on its electronic reading room web site.  Redacted portions of the reports are not publicly available but will be requested on behalf of Plaintiff for production by the Defendants during discovery in this matter). These Form 483 reports identify widespread and systemic deficiencies at Triad's manufacturing facility and put or should have put Triad on notice of dangerous shortcomings at its manufacturing facility that posed a risk to public health and safety, including but not limited to manufacturing and quality control

deficiencies resulting in the shipment of contaminated alcohol prep pads as well as the shipment of "sterile" alcohol prep pads that were, in fact, not sterile.

22.     **The FDA Form FDA-483 Issued on July 17, 2009**.   Federal inspectors for the FDA inspected Triad's manufacturing facility in July of 2009 and issued a Form FDA-483 ("Form 483") on July 17, 2009.   The Form 483 identified a number of observations reflecting quality control issues and deficiencies.   For example, it observed that responsibilities and procedures applicable to the quality control unit "are not in writing and fully followed."   It further observed that investigations of a failure of a particular batch of product did not extend to other batches of the same product.

23.     Other observations of the July 2009 Form 483 report called into question whether Triad's products met relevant and applicable product specifications.   Observation 6 of the July 2009 Form 483 report noted that "[*d]rug products failing to meet established specifications are not rejected*." (emphasis added).   Observation 7 noted that "[d]eviations from written specifications are not justified."   Observation 8 of the July 2009 Form 483 report stated that Triad accepted reports of analysis from its component suppliers instead of testing each component for conformity to written specifications and without establishing reliability of the supplier's analysis.

24.     Some of the observations from the July 2009 Form 483 indicated the potential for product contamination.   For example, Observation 10 found that "[e]quipment used in the manufacture, packing or holding of drug products is not of appropriate design to facilitate operations for its intended use and cleaning and maintenance."   Observation 11 noted that equipment and utensils are not appropriately maintained to prevent contamination that would alter the safety, quality or purity of the product.   Observation 12 observed that written

procedures were not followed for the cleaning and maintenance of equipment used for drug products.

25.     The July 2009 Form 483 also questioned Triad's sampling and testing procedures.   Observation 15 noted that the "number of containers to be sampled is not based upon appropriate criteria" and Observation 16 noted that the "accuracy, sensitivity, specificity, and reproducibility of test methods have not been established and documented."  Observation 19 noted that Triad "*has not validated any of their manufacturing processes for OTC drug products*" including sterile alcohol wipes. (emphasis added).

26.     **The FDA Form-483 Issued on May 18, 2010**.   Not quite a year after issuing its July 2009 Form 483, the FDA issued another Form 483 on Triad's manufacturing facility on May 18, 2010, which took into account findings from inspections conducted in April and May of 2010.

27.     Instead of correcting the deficiencies noted by the FDA in its first Form 483, Triad allowed these deficiencies to continue.   The FDA's second Form 483 indicated continuing quality control problems and potential contamination problems at the Triad facility. Observation 8 from the May 2010 Form 483 noted that "*[p]rocedures designed to prevent microbiological contamination of drug products purporting to be sterile are not followed*." (emphasis added).  Observation 8 went on to discuss how this finding pertained specifically to the sterilization of alcohol pads.

28.     The May 2010 Form 483 continued to note the existence of problems in ensuring that products met specifications. Observation 11 stated that "[d]rug products failing to meet established specifications are not rejected."

29.     Numerous other observations in the May 2010 Form 483 called into question the ability of the manufacturing facility to ensure that it was producing products according to specification that were uncontaminated, sterile and safe for use by consumers.

30.     **The FDA Form FDA-483 Issued on January 7, 2011**.  Earlier this year, federal inspectors for the Food and Drug Administration ("FDA") documented a slew of contamination and quality control problems at Triad's Wisconsin manufacturing facility.  On January 7, 2011, the FDA issued a Form 483 on Triad's manufacturing facility based on a series of FDA inspections of the facility that took place between November 29, 2010 and January 7, 2011.   The Form 483 was posted on-line with some limited redactions by the FDA's Office of Regulatory Affairs ("ORA") in the ORA FOIA Electronic Reading Room on or about February 22, 2011.

31.     The FDA Form-483 documented an extensive array of quality control, quality assurance, contamination and sterilization issues at Triad's facility which reflect a manufacturing process with glaring and systemic deficiencies that reflect how Triad likely was distributing contaminated and otherwise defective and deficient products to consumers.   Some of the quality and contamination issues documented by the FDA in the Form 483 include the issues discussed in the following paragraphs.

32.     According to the January 2011 FDA Form 483, product at triad's manufacturing facility that was irradiated prior to October 1, 2010 and was under sterilized was nonetheless accepted and released for distribution without a health hazard analysis being conducted.

33.     According to the January 2011 FDA Form 483, Triad did not have properly established procedures to prevent product contamination by substances that can adversely affect product quality.   The Form 483 noted the following sources of what the FDA termed

"bioburden" on December 1, 2010:  lubricating jelly mixing and holding tanks were left uncovered; at least one tank had holes "that were a potential route of contamination"; rollers that contact the inside of product packaging had built up dirt and dust; and a sterile air filter was in need of being changed.

34.    According to the January 2011 FDA Form 483, Triad did not fully follow quality control procedures.  For example, the Form 483 found that Quality Assurance Unit authorities responsible for overseeing daily operations did not ensure that the responsibilities for the QC/QA lab were enforced regarding rejection of contaminated product.

35.    According to the January 2011 FDA Form 483, there was inadequate documentation that products slated for destruction were actually destroyed and the products were no longer at hand.

36.    According to the January 2011 FDA Form 483, Triad did not reject products failing to meet its specifications and potentially contaminated products appear to have been shipped to consumers.   Specifically, the Form 483 noted that: "*Drug products failing to meet established specifications are not rejected*." (emphasis added). The Form 483 describes the following instance of apparent contamination of sterile alcohol prep pads (redactions in the report are indicated by "**. . .**"):

"Samples from lot 0L445 of sterile alcohol prep pads were submitted for a quarterly dose audit.  Triad was informed by their contract testing laboratory on 11/30/10 *the sterility test failed because . . . of the  . . .  samples had growth.*  A QA investigation, INV-10-003, was initiated on 12/1/10, but no lots of sterile alcohol pads were placed on hold.  **. . .** *cases of lot 0L445 were shipped to customers on 12/2/10.*  Identification of

the sterility isolates were confirmed as **. . .** on 12/3/10. **. . .** *additional cases of lot 0L445 were shipped from 12/10/10-12/14/10.* (emphasis added).

37.    According to the January 2011 FDA Form 483, product that was under sterilized was accepted and released for distribution, possibly going back to June of 2010.

38.    According to the January 2011 FDA Form 483, Triad's facility did not properly validate product.   The FDA Form 483 specifically observed that *"[t]here was no sterile alcohol prep pad validation prior to 3/12/10."* (emphasis added).  Equally disturbing was the lack of any follow-up to assess potential health impact on the public.   The Form 483 states that "[n]o investigation or health hazard analysis was conducted for the product on the market that was made without a validation and with a sterilization dose that was determined to be too low during the validation."

39.    According to the January 2011 FDA Form 483, Triad did not extend investigations of unexplained discrepancy and failure of a batch to meet specifications to other batches that could have been associated with the same discrepancy or failure.   Alcohol pads appear to have been distributed that should have been inspected for failure prior to distribution. The Form 483 sets forth that: "Quarterly dose audits of the sterilization cycle for sterile alcohol pads test **. . .** of product that represents all of the manufactured sterile alcohol pads for that quarter.   On 11/30/10 Triad was informed the fourth quarter dose audit failed the sterility test. No lots of sterile alcohol pads were placed on hold, sterile alcohol prep pads distributed 12/1/10-12/14/10 totalled approximately **. . .** cases."

40.    Observation 19 of the January 2011 Form 483 noted that products purporting to be sterile were not properly tested to determine their quality.   Specifically, the Form 483 noted: "Each batch of drug product purporting to be sterile is not laboratory tested to determine

conformance to such requirements. Specifically, *there is no finished product sterility testing or laboratory . . . testing for sterile alcohol prep pads or sterile alcohol swabsticks*" (emphasis added).

41.    Observation 20 of the January 2011 Form 483 noted that "Each batch of drug product required to be free of objectionable microorganisms is not tested through appropriate laboratory testing."

42.    According to Observation 22 of the January 2011 FDA Form 483, "[e]stablished sampling plans are not followed." Specifically, the Form 483 observed as follows regarding Triad's failure to follow required sampling plans for its alcohol pads:

"Bioburden monitoring and quarterly does audits (QDA) of the sterile alcohol pads and swabsticks are to be completed on a quarterly basis per SOP-LAB-005-00 "Performing Quarterly Dose Audits of Sterilized Products" effective 9/22/10 which replaced SOP-WI-QA-0006 effective 1/11/07, the following audits did not follow these procedures: 1) There was no quarterly dose audit conducted in quarter two of 2010 for sterile alcohol pads. 2) There was no quarterly does audit conducted in quarter three of 2010 for sterile alcohol swabsticks."

43.    The FDA's observations and findings of quality control, quality assurance and contamination deficiencies at Triad's manufacturing facility in the period preceding the Triad recall reflect a pattern of deficiencies and quality control shortcomings that should have caused a prudent corporation to take appropriate action to clean up its manufacturing processes, ensure product sterility and quality and, as appears necessary, issue an appropriate and timely recall. Triad, however, failed to undertake such prudent actions and instead appears to have shipped

contaminated products and so-called "sterile" products that were not in fact sterile to unsuspecting consumers who require the use of sterile products, including the Plaintiff.

44.     Early reports of the extent of contamination and deficiencies in the recalled alcohol prep pads indicate that a significant percentage of certain lots of products that were distributed could be contaminated.  MSNBC.COM reported on March 24, 2011 that Children's Hospital in Aurora Colorado tested 60 Triad alcohol prep pads in the Fall of 2010 and found that 40 of them were infected with Bacillus cereus bacteria.

45.     **Plaintiff's Infection and Injuries and the Continuing Risk to Consumers**. Had Triad issued the recall in a timely and appropriate manner, Plaintiff would not have suffered her life threatening infection.  Triad's recall was not issued until long after it had notice of both potential contaminated product being distributed as well as "sterile" product being distributed that likely was not actually sterile.   Triad thereby knew or should have known of the risk to consumers such as Plaintiff.

46.     Even after Triad made the decision to issue the recall, Triad made insufficient efforts to notify consumers such as Plaintiff of the recall of its products and of the risks posed by the use of its recalled products.   This problem was compounded by the continuing shipment of certain contaminated products to consumers that continued until at least mid February of 2011.

47.     Plaintiff was not informed about the recall by Triad or by anyone else until after she developed her life threatening infection.  Plaintiff suffered her infection and injuries because of Triad's negligent and deficient manufacturing processes, its sale and shipment of contaminated, defective and deficient alcohol prep pads, its failure to recall its contaminated

products in a timely manner, and its failure to appropriately disseminate news of the recall to consumers after the recall was issued.

48.     Large numbers of consumers remain at risk due to Triad's shipment of potentially contaminated product, its delay in issuing the recall, its failure to adequately disseminate notice of the recall and the apparent continuing shipment of contaminated products that continued after the recall was announced.

49.     **Triad's Shutting Down of Its Alcohol Prep Pad Products Line.**  On or about March 11, 2011, it was reported by MSNBC.COM that Triad was shutting down the line that manufactured the contaminated alcohol prep pads.  It was unclear how long the closure would be in effect, and it was reported that it may be "short term."

50.     **Additional Recall Arising Out of Triad's Deficient and Negligent Manufacturing Processes.**   The manufacturing deficiencies plaguing Triad appear to have resulted in at least one additional recall.  Just a little over two months after the announcement of the recall of Triad alcohol prep pads and other alcohol products, it was recently announced that Triad was recalling all lots of povidine iodine prep pads after testing revealed that the iodine pads may be infected with a rare bacteria that can lead to life threatening infections.

51.     **Triad's Acknowledgement of Systemic Quality Control Deficiencies.**   On January 28, 2011, H&P Industries, Inc. President Eric Haertle wrote a letter to the FDA responding to certain of the FDA's Inspectional Observations.  A copy of a partially redacted portion of the letter was recently posted on the FDA's ORA Electronic Reading Room web site. (References herein to the letter are to the publicly available portions of the letter.  The redacted portions of the letter are not publicly available but will be requested on behalf of Plaintiff for production during discovery in this lawsuit).  In the letter, H&P Industries, Inc.

admitted to and acknowledged the existence of significant deficiencies at its manufacturing facility. Specifically, President Haertle wrote that: "*The Quality Control Laboratory has experienced systemic failures and has been inadequately staffed and managed.*" (emphasis added). He further acknowledged that "systemic failures" were noted in the FDA's latest Form 483 and that "changes are required in Operations/Manufacturing to meet the expectations necessary to comply with all regulatory thresholds."

52.     H&P Industries, Inc.'s January 28, 2011 letter to the FDA also acknowledged serious staffing deficiencies, including the lack of a single degreed engineer on staff. The letter indicates that various employees were terminated or relieved of their duties in the wake of the FDA inspections and also refers to the "lack of accountability associated with random movement of employees."

53.     In addition to acknowledging widespread and systemic quality control deficiencies and staffing deficiencies, H&P Industries, Inc.'s January 28, 2011 letter to the FDA further discussed other apparent deficiencies relating to Sterile and Non-Sterile Alcohol production, including the voluntary shutdown of manufacturing and distribution of Sterile and Non-Sterile Alcohol production in December of 2010. The letter further indicates that Sterile Alcohol process validations will not be completed until April of 2011.

54.     **The FDA's Request That Triad Halt Production**. On March 28, 2011, it was reported by MSNBC.COM that the FDA has requested Triad to voluntarily stop making and distributing its drug products. Michael Rogers, the FDA's acting director of the Office of Regional Operations, was quoted by MSNBC.COM as stating: "We have evidence that shows this firm made and distributed products with a variety of opportunistic pathogens." It is alleged on information and belief that formal discovery in this matter is likely to reveal the

nature and identification of the additional opportunistic pathogens referred to by FDA acting director of the Office of Regional Operations Rogers.

## FIRST CAUSE OF ACTION
### (STRICT PRODUCTS LIABILITY – AGAINST ALL DEFENDANTS)

55.     Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation and statement made elsewhere in this complaint.

56.     The Triad brand sterile alcohol prep pads distributed over the course of the past year or more, including the alcohol prep pads used by Plaintiff, were defectively designed, manufactured, fabricated, distributed, sold, retailed, wholesaled, recommended, tested, prepared, constructed, packaged, promoted, supplied and placed into the stream of commerce by Triad.  These Triad brand alcohol prep pads will hereinafter be referred to as the "subject alcohol prep pads."

57.     Triad designed, manufactured, distributed and sold the subject alcohol prep pads and placed the subject contaminated alcohol prep pads into the stream of commerce knowing that consumers would use them in their intended and foreseeable manner, which would include using the pads immediately before giving themselves injections. As such, it clearly was foreseeable that skin would be broken and contaminants would and could be deposited under the skin where they could cause serious and life threatening infections.

58.     At the time that the Plaintiff used the contaminated Triad alcohol prep pads, she used them in a manner and fashion that was foreseeable by Triad.  Specifically, Triad knew that consumers like the Plaintiff would use the so called "sterile" alcohol prep pads just prior to giving themselves injections.   Triad knew that contaminated prep pads could deposit contaminants, including Bacillus cereus bacteria, onto the consumer that could then get into the

16

skin opening from the injection.  Triad also knew that prep pads that were not sterile could also result in contaminants, including bacteria, getting under the skin if the non-sterile prep pad did not fully clean and disinfect the injection site and/or deposited additional contaminants onto the skin.

59.     At the time the subject alcohol prep pads left the control of Triad, they were defective and unreasonably dangerous to a person who might reasonably be expected to use them.  These defects include, but are not limited to, the conditions described in this cause of action and as also described in detail throughout this Complaint.

60.     The subject alcohol prep pads were contaminated when they left Triad's control, and Triad knew or should have know that they were contaminated and posed a significant health and safety risk to anyone who might use them.

61.     The subject alcohol pre pads were contaminated with Bacillus cereus bacteria which can cause life threatening infections to the users of the contaminated pads.

62.     The subject alcohol prep pads were not sterile and thereby could prove ineffective in cleaning and disinfecting injection sites, resulting in contaminants getting under the skin at injection sites.

63.     By definition, the subject alcohol pads, which were supposed to be "sterile" and were marked and labelled as "sterile," suffered from a defect because they were not sterile and, in fact, were contaminated.

64.     The subject alcohol pads were defectively manufactured in that they were contaminated with Bacillus cereus bacteria as well as possible additional pathogens, were not sterile, were incapable of properly or adequately cleaning or disinfecting a skin site prior to an injection, and were likely to subject consumers to potentially deadly infections.

65.     The subject alcohol prep pads lacked adequate and sufficient warnings and instructions about the risks, dangers, and harms presented by the Subject alcohol prep pads as described in detail herein and the reasonable means to reduce such risks, dangers and harms.

66.     The subject alcohol prep pads were sold by Triad and intended by Triad to be incorporated into pre-packaged injection kits, in which the contaminated and/or not fully sterile pads would be used just prior to a consumer giving herself or himself an injection.   Thus, the subject alcohol prep pads posed a significant risk of causing or resulting in contaminants being pushed or deposited under the skin and into the body tissue and/or bloodstream when and as a result of the injection being given.

67.     The subject alcohol prep pads were admittedly defective and unreasonably dangerous by virtue of Triad's recall and the announcement by Triad that use of the pads could lead to a "life threatening infection."   Triad, in effect, has publicly conceded and admitted that at least portions of the recalled alcohol prep pads are defective and unreasonably dangerous.

68.     Because Triad was conducting inadequate quality control and was engaged in insufficient verification and validation of sterility of its alcohol prep pads, all of the recalled sterile alcohol prep pads should be presumed to be defective and deficient.

69.     The subject alcohol prep pads posed a particularly significant risk to those consumers who receive pre-packaged injection kits because they use the pads and then immediately break the skin on a regular basis, making infection likely.

70.     The subject alcohol prep pads also posed a particularly significant risk to those individuals with preexisting medical conditions such as Multiple Sclerosis and other medical conditions.

71.     The subject alcohol prep pads were labelled as sterile but were not sterile since they were contaminated with bacteria.

72.     The subject alcohol prep pads were labelled as sterile but were not fully sterile and did not meet Triad's specifications for sterility.   The subject alcohol prep pads were shipped from Triad's facility without proper testing or validation analysis to ensure they were in fact sterile.

73.     The subject alcohol prep pads were expected by Triad to reach, and did reach, the user without substantial change in the condition in which they were placed on the market.

74.     Jayme Maestas was a person who would reasonably be expected to use the subject alcohol prep pads.

75.     Jayme Maestas used the subject alcohol prep pads in the manner in which Triad knew and intended they would be used.

76.     Jayme Maestas used what she thought was a sterile alcohol prep pad and what was labelled as a sterile alcohol prep pad, and she was reasonably entitled to expect and presume that the alcohol prep pad was in fact sterile and free of contaminants.

77.     As a direct and proximate result of defects, contaminants and deficiencies in the subject alcohol prep pads and the wrongful conduct, acts and omissions of Defendants, Plaintiff suffered a serious and debilitating infection, requiring ongoing medical treatment and resulting in significant injuries and damages.


## SECOND CAUSE OF ACTION
### (NEGLIGENCE – AGAINST ALL DEFENDANTS)

78.     Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation and statement made elsewhere in this complaint.

79.     At all times herein relevant, the Triad Defendants were and are engaged in the business of, including but not limited to, selling, designing, manufacturing, distributing, wholesaling, testing, advertising, creating, processing, preparing, packaging, providing, warranting, labelling, promoting, advertising, furnishing, retailing, analyzing, inspecting, supplying, and placing into the stream of commerce the subject alcohol prep pads and other contaminated alcohol products.

80.     Triad, including their employees, agents, directors, officers, stockholders, partners and associates, had a legal duty to conform their conduct in accordance with that of a reasonable person, which includes adequately and properly managing and operating their business and their manufacturing process for the subject alcohol pads and other alcohol products and which also includes acting without negligence, conscious disregard, despicable or other wrongful conduct.

81.     Triad had a duty to follow its established quality control and quality assurance procedures that presumably were adopted and promulgated to ensure that product was safely manufactured.

82.     Triad had a duty not to ship product to consumers that was contaminated, that was at risk of being contaminated and/or that had not been properly validated as safe and sterile prior to shipment.

83.     Triad had a duty to properly inspect, test and sample lots and batches of product at its manufacturing facility to ensure that "sterile" product was, in fact, sterile.

84.     Triad had a duty to properly inspect, test and sample lots and batches of product at its manufacturing facility to ensure that so called "sterile" product did not, in fact, contain contaminants, including bacteria.

85.     Triad had a duty to properly inspect, test and sample lots and batches of product at its manufacturing facility to ensure that product being shipped to consumers was free of contaminants, particularly contaminants such as the Bacillus cereus bacteria that can cause life threatening infections.

86.     Triad negligently designed, tested, approved, manufactured, marketed, distributed, and sold the subject alcohol prep pads in that it failed to exercise reasonable care to prevent the subject alcohol prep pads from creating an unreasonable risk of harm to a person who might reasonably be expected to use them in an expected or reasonably foreseeable manner.

87.     In undertaking the actions alleged throughout this complaint, Triad, including their employees, agents, directors, officers, stockholders, partners and associates, breached their legal and common law duties, including their duties set forth herein, and failed to conform their conduct in accordance with the law and that of a reasonable corporation, causing the injuries and damages to Plaintiff.

88.     At the time of the design and manufacture of the subject alcohol prep pads, the Triad Defendants were aware or should have been aware of the defects in the subject alcohol prep pads as discussed herein but inserted them into the stream of commerce anyway, without regard for the health and safety of consumers like the Plaintiff who would use the products.

89.     At the time of the design and manufacture of the subject alcohol prep pads, the Triad Defendants were aware or should have been aware of quality control and quality assurance deficiencies at their manufacturing facility that indicated that products were at risk of contamination, but Triad failed to take appropriate measures to remedy its deficient and

unsafe manufacturing processes and shipped product to consumers that it knew or should have known was at risk of being contaminated.

90.      Triad knew or should have known of the slew of deficiencies at its manufacturing facility noted and called out by the FDA in the FDA's Form 483 reports, but Triad shipped product to consumers anyway, without undertaking appropriate efforts or analyses to ensure that the product was safe and contaminant free.

91.      The deficiencies called out by the FDA in its Form 483 reports reflect a manufacturing and quality control process that was glaringly deficient, one which should have put a reasonable corporation on notice of the immediate need to improve quality control and quality assurance as well as of the immediate need to engage in timely and appropriate recalls of product at risk of contamination and/or at risk of not being sterile.

92.      Triad knew or, in light of its manufacturing and quality deficiencies, should have known that it was likely shipping contaminated product as well as "sterile" product that was not sterile to consumers, but Trial continued shipping such product anyway, without engaging in the type of hazard analysis or investigation in which a reasonable corporation would have engaged.

93.      Defendants were aware of the dangers of subjecting consumers to the Bacillus cereus bacteria, but Defendants took inadequate measures to ensure that their alcohol products were free from such bacteria.

94.      Triad was aware of the dangers of shipping non-sterile products to consumers like the Plaintiff who depend upon sterile product to clean and disinfect injection sites, but Defendants took inadequate measures to ensure that their alcohol products were actually sterile.

95.     Triad's announcement of the recall was not timely and Triad knew or should have known that the recall should have been initiated sooner to avoid subjecting consumers to needless risk of injury.

96.     When Triad did announce the recall, it made deficient and inadequate efforts to ensure that the users of its products, such as Plaintiff, received notice of the recall.   Triad had a duty to reasonably and competently inform consumers of the recall, and Triad failed to do so.   Plaintiff did not receive oral or written notice of the recall until long after the recall had been announced.

97.     The Triad Defendants' knowledge as described in this Complaint is believed to be reflected in the writings, communications and electronic communications of various Triad groups, committees, departments and employees and personnel.

98.     The Triad Defendants' knowledge as described in this Complaint is reflected in part in the FDA's documentation of deficiencies and failure to follow Quality Control and Quality Assurance procedures at Triad's manufacturing facility.

99.     The Triad Defendants' knowledge as described in this Complaint is believed to be further reflected in part in the redacted portions of the FDA's Form 483 reports, which are not at this time publicly available but which will be requested on behalf of Plaintiff for production during discovery in this lawsuit.

100.     The Triad Defendants' negligence is believed to be reflected in other incidents in which consumers have suffered serious and debilitating infections due to their usage of contaminated Trial alcohol products.

101.     The Triad Defendants' knowledge as described in this Complaint is believed to be reflected in the results of analyses conducted by Triad and others, including the

documentation as well as the missing documentation referred to by the FDA in its Form 483 reports.

102.    The Triad Defendants acted unreasonably and were negligent in designing, manufacturing, marketing, selling and distributing alcohol prep pads that were labelled as sterile but were, in fact, contaminated with bacteria.

103.    The Triad Defendants acted unreasonably and were negligent in designing, manufacturing, marketing, selling and distributing alcohol prep pads and other alcohol products that presented a substantial and unreasonable risk of injury or death to the users of those products, including Jayme Maestas.

104.    The Triad Defendants' negligence was a direct and proximate cause of the infection to the Plaintiff and of her ensuring injuries and damages.

105.    As a direct and proximate result of defects in the Subject alcohol prep pads and the wrongful conduct, acts and omissions of the Triad Defendants, Plaintiff suffered serious injuries and damages as described and alleged herein.

**THIRD CAUSE OF ACTION**
**(BREACH OF EXPRESS AND IMPLIED WARRANTIES –**
**AGAINST ALL DEFENDANTS)**

106.    Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation and statement made elsewhere in this complaint.

107.    The Triad Defendants knew the particular purposes for which the subject alcohol prep pads were required and were to be used, and that purchasers and users such as Jayme Maestas would rely on the Triad Defendants' skill or judgment in designing, testing, manufacturing, and furnishing goods suitable for such purposes and uses.

108.     The subject alcohol prep pads were not free from defects or fit for the purpose for which they were to be used, and were in fact defectively designed, manufactured, and distributed and imminently dangerous to consumers and users and they were capable of causing, and in fact did cause, serious injuries to the users and consumers thereof, including Jayme Maestas, while being used in a manner reasonably foreseeable to Defendants.  As a result, the subject alcohol prep pads were unsafe and dangerous for use by the consumer, including Jayme Maestas.

109.     The Triad Defendants impliedly and expressly warranted to Jayme Maestas and foreseeable users of the subject alcohol prep pads that the subject alcohol prep pads were fit for the purpose for which they were intended to be used and were free from defects and contamination.

110.     The Triad Defendants expressly and impliedly warranted to purchasers and users of their alcohol prep pads that they were sterile, but the subject alcohol prep pads were not in fact sterile.

111.     The Triad Defendants impliedly warranted to purchasers and users of their alcohol prep pads, including the general public and Jayme Maestas, that their products including the subject alcohol prep pads were suitable for their intended use, were of merchantable quality, and had no substantial risk of causing a serious and potentially deadly infection.

112.     The Triad Defendants expressly warranted to purchasers and users of their alcohol prep pads, including the general public and include Jayme Maestas, that such products were "sterile" but the alcohol prep pads were not sterile and were contaminated, constituting a breach of Triad's express warranties.

113.    The subject alcohol prep pads were defective and were not of merchantable quality and were not fit for their intended purpose in that they were capable of causing, and, in fact, did cause serious infections and injuries to users and consumers thereof, including Jayme Maestas, while being used in a manner reasonably foreseeable to the Triad Defendants.

114.    As a direct and proximate result each breach of the Triad Defendants' implied and express warranties, Plaintiff suffered the injuries and damages as herein alleged.


**FOUTH CAUSE OF ACTION**
**(COLORADO CONSUMER PROTECTION ACT – AGAINST ALL DEFENDANTS)**

115.    Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation and statement made elsewhere in this complaint.

116.    In marketing, distributing and selling the subject alcohol prep pads, the Triad Defendants made false and misleading statements and representations (including a representation that the products were "sterile") and also failed to disclose material information relating to the safety of the subject alcohol prep pads -- including the information relating to quality control deficiencies, the lack of testing and validation to ensure that their products were sterile and the information relating to contaminants discussed throughout this Complaint -- and thereby intended to induce consumers such as Jayme Maestas to use and purchase alcohol products they otherwise would not have purchased had this information been disclosed.

117.    The making of false and misleading statements as to the so-called safety and sterility of the subject alcohol prep pads and the failure to disclose the material information relating to the potential for contamination in the subject alcohol prep pads tended to deceive and mislead consumers such as Jayme Maestas.  Specifically, the making of false and misleading statements as to the so-called safety and sterility of the subject alcohol prep pads

and Triad's other alcohol products and the failure to disclose the material information relating to the lack of sterility and the contamination by Bacillus cereus bacteria in the subject alcohol prep pads and its other alcohol products constitutes an unfair and deceptive trade practice for purposes of the Colorado Consumer Protection Act.

118.    Triad knew or should have known about the potential for contamination in its alcohol prep pads but Triad continued to distribute and sell those alcohol prep pads as "sterile" products anyway.  Triad also knew or should have known that many of its alcohol products were not sterile but Triad continued to distribute and sell those products as "sterile" products anyway. This constitutes the making of false and misleading statements within the meaning of the Colorado Consumer Protection Act.

119.    Triad knew or should have known about the potential for lack of sterility and contamination in its alcohol prep pads and Triad knew or should have known that this information would be material information to consumers who otherwise used and purchased Trial products and, in particular, relied upon receiving sterile products that were actually sterile, but Triad failed to disclose this information.

120.    The activities described herein and throughout this Complaint were undertaken in the course of Triad's business.  Specifically, the making of false and misleading statements and the failure to disclose material information relating to the safety and potential lack of sterility of the subject alcohol prep pads and its other alcohol products were made in the regular course of commerce.

121.    The false and misleading statements made by Triad in connection with the sale of the Subject alcohol prep pads are the type of statements that tend to deceive and do deceive and mislead consumers, including Jayme Maestas.

122.     The making of false and misleading statements and omission of material safety information as regards the subject alcohol prep pads and in Triad's other alcohol products set forth throughout this Complaint constitute false, misleading and deceptive acts and practices within the scope and meaning of the Colorado Consumer Protection Act ("the Act").

123.     The making of false and misleading statements and omission of material safety information as regards the subject alcohol prep pads and in Triad's other alcohol products set forth throughout this Complaint constitute practices which significantly impact the public as actual or potential consumers of the defendant's goods, services, or property. Members of the public, including Plaintiff, were significantly impacted when they purchased Triad products believing them to be safe but were then injured by infections caused by the contaminated or otherwise deficient (i.e., not sterile, etc.) products.    Other members of the public have reportedly suffered life threatening infections after using Triad's defective alcohol products.

124.     Triad's false, misleading and deceptive statements, acts and practices were committed knowingly and wilfully in the regular course of business and in connection with the sale of its products, including the subject alcohol prep pads, thus entitling Plaintiff to statutory damages pursuant to the Act.

125.     Triad's false, misleading and deceptive statements, acts and practices, and its violation of express and implied warranties constitute violations of the Act, thus entitling Plaintiff to all the remedies available under the Act, including statutory damages, treble damages, costs and attorneys' fees.

## CAUSATION AND DAMAGES
### (ALL DEFENDANTS)

126.     Plaintiff incorporates herein by reference, as though fully set forth at length, each and every allegation and statement contained in the foregoing paragraphs.

127.     As a direct and proximate result of the actions and omissions of the Defendants set forth herein, Plaintiff has incurred the following general and special damages, including without limitation:

    a.  Mental and physical pain and suffering, past and future;

    b.  Reasonable and necessary medical, hospital and rehabilitation care and services, medication, therapy and other care expenses, past and future;

    c.  Extreme emotional distress, past and future;

    d.  Loss of enjoyment of life and impairment of the quality of life, past and future;

    e.  Physical impairment;

    f.  Disfigurement;

    g.  All statutory damages permitted under the Consumer Protection Act, including but not limited to attorneys' fees and treble damages;

    h.  Any other losses and damages sustained by Jayme Maestas and to which she is legally entitled either under common law or pursuant to statute, including costs and attorneys' fees; and

    i.  For such other and further relief as the Court may deem just and proper.

128.     Plaintiff further seeks all costs, attorney fees, and prejudgment and post-judgment interest as permitted and provided by the law.

**WHEREFORE**, Plaintiff prays for and demands an award of damages to be fixed by the trier of fact in a reasonable amount.  Additionally, Plaintiff asks for the costs of this action,

reasonable attorney fees pursuant to statute as cited above, all pre-judgment and post-judgment interest as provided by law, and such other relief to which she is legally entitled and as the Court deems appropriate.

Respectfully submitted this 29th day of March, 2011.

Paul J. Komyatte (No. 22750)
Ridley, McGreevy & Winocur P.C.
303 16th Street, Suite 200
Denver, Colorado 80202
Phone: (303) 629-9700
Fax:    (303) 629-9702


By:  *s/ Paul J. Komyatte*
        Paul J. Komyatte

## ATTORNEYS FOR PLAINTIFF


### JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable.

Respectfully submitted this 29th day of March, 2011.

Paul J. Komyatte (No. 22750)
Ridley, McGreevy & Winocur P.C.
303 16th Street, Suite 200
Denver, Colorado 80202
Phone: (303) 629-9700
Fax:    (303) 629-9702


By:  *s/ Paul J. Komyatte*
        Paul J. Komyatte